# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 2:24-MJ-4668 |
| 3875 COCO AVENUE, APT 9 LOS ANGELES, CA 90008 | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1028, 1708, 1344, 1349, 1956, and 26 U.S.C. § 7201 | See affidavit and Attachment B |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Elle Sarracco
_____
*Applicant's signature*

Special Agent Elle Sarracco
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA

Honorable Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11ᵗʰ Floor

## ATTACHMENT A

PREMISES TO BE SEARCHED

3875 COCO AVENUE, APT 9, LOS ANGELES, CA 90008 ("STINSON'S APARTMENT"). STINSON'S APARTMENT is an apartment in a small complex located on the west side of COCO AVE., south of August St.  Above the main entrance of the complex is the street number "3875", which runs horizontally in dark-colored numerals. The complex is about two stories high. The exterior of the building is tan in color, with two stone pillars each located on either side of the main entrance. Behind the complex is an alley way which runs from August St. to Pinafore St. and is parallel to the back of the complex. There is a courtyard in the center of the complex, which all of the units surround. The entrance to STINSON'S APARTMENT has two doors, a brown interior door, and a black cage exterior door. STINSON'S APARTMENT is marked by the number "9" to left of the apartment doors. STINSON'S APARTMENT is on the second residential floor, in the southeast corner of the building.

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1028, 1708, 1344, 1349, 1956, and 26 U.S. Code § 7201 (identity document fraud, mail theft, conspiracy to commit bank fraud, money laundering, and tax evasion, collectively referred to as the "SUBJECT OFFENSES"):

a.    Personal identifying information of individuals other than those residing at the premises being searched, or who own or use the vehicle being searched, including social security numbers, other identifying numbers, dates of birth, addresses and telephone numbers, credit, gift, or debit card information, PINs, credit reports, and bank or other financial institution information, and records referring or relating to such information;

b.    Documents and records containing coded language, such as "stats," "slips," "plugs," numbers without units (i.e., "the 93," or "the 47 from 7/11/24"), or which refer to selling checks, sharing the proceeds from a check, selling anything for less than 25% of its value, checks which were unsuccessfully negotiated or deposited, or rejected bank transactions;

c.    Counterfeit identity documents, such as passports and driver's licenses, whether blank, completed, or partially completed, and their components, such as seals, watermarks, security windows, official signatures or the cutting-and-pasting of signatures, holographic security features, ultraviolet printed features, raised micro dot features, and translucent Teslin printed design components, identification-proportioned photographs of faces, and programs or records referring or relating to them;

d.   Checks, mail matter, and shipping packages, opened or unopened, not addressed to or from an owner or user of the vehicle being searched, or the residents of the premise being searched, and documents or records referring or relating to the same;

e.   Currency, prepaid debit or credit cards, and casino chips with a value in excess of $1,000, including the first $1,000 if more than $1,000 is found;

f.   Documents and keys relating to public storage units, rental cars, prepaid cellular telephones, safety deposit boxes, Commercial Mail Receiving Agencies, or receiving mail at someone else's address;

g.   Records referring or relating to counter surveillance of law enforcement, prison, arrests, criminal investigations, criminal charges, asset forfeiture, investigations by financial institutions, and the threatened or actual closure of accounts by financial institutions;

h.   Documents and records referring or relating to currency transaction reports (CTRs), their reporting thresholds, attempting to structure cash transactions to avoid CTRs, cash transactions totaling over $10,000 even if conducted in lesser increments, or the purchase of more than $3,000 of postal money orders in a two-week period, or conducting multiple cash ATM transactions or purchasing multiple postal money orders on the same day;

i.   Records relating to wealth and the movement of wealth since 2020, such as tax returns and forms, crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal, Zelle, CashApp, and Venmo, money orders, brokerage

and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $1,000;

j.   Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched, such as keys, rental agreements, leases, utility bills, identity documents, cancelled mail, and surveillance video;

k.   Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and Signal, ICQ, Telegram, and email addresses.

l.   Cryptocurrency and related records and items, such as those referring or relating to public or private keys or addresses, or cryptocurrency wallets or their parts, including "recovery seeds" or "root keys" which may be used to regenerate a wallet. Seizure of the cryptocurrency and wallets will be accomplished by transferring or copying them to a public cryptocurrency address controlled by the United States, or by restoring them onto computers controlled by the United States.

m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and

cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

3.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

5.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team will not

search for similar evidence outside the scope of the items to be seized without first obtaining authority to do so.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1)itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

8

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device

8.   During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of the TARGET SUBJECTS onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the TARGET SUBJECTS with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant, and do not apply to any other search of digital devices.

**AFFIDAVIT**

I, Elle Sarracco, being duly sworn, declare and state as follows:

**INTRODUCTION**

1.     I am a Special Agent employed with the U.S. Postal Service Office of Inspector General ("USPS OIG"), in the Los Angeles territory, since June 2023. Prior to becoming a Special Agent with the USPS OIG, I was also employed part-time with the USPS OIG in Brooklyn, NY, where I worked alongside and gained experience from various Special Agents with a combined over twenty years of experience working in the field. Prior to becoming a Special Agent, I also obtained a Master of Arts Degree in Criminal Justice at John Jay College of Criminal Justice. I also obtained an Advanced Certificate in Criminal Investigations, where I successfully completed and earned the highest award of honors while completing various courses of instruction in investigations.

2.     I have completed a 12-week Criminal Investigator Training Program at the Federal Law Enforcement Training Center, which included instructions in various courses pertaining to criminal investigations. I am currently assigned as a Special Agent with the Los Angeles Mail Theft team. As a Special Agent assigned to that team, I am responsible for the investigation of stolen U.S. Mail by a Postal Service employee, and further the unlawful use of stolen mail, which may include check fraud, credit card fraud, bank fraud, and identity theft.

## I.  <u>PURPOSE OF AFFIDAVIT: SEARCH WARRANTS</u>

3.    This affidavit is made in support of search warrants for the residences and vehicles of CHARLIE BANKS GREEN JR., aka "Worm," aka "lilwestworm," RASHAD DEON STOLDEN, aka "Patrick P," and ANNDRAYA ALLIE J. STINSON, aka "Skinny," (collectively, the TARGET SUBJECTS) for evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 1028, 1708, 1344, 1349, 1956, and 26 U.S.C. § 7201 (identity document fraud, mail theft, conspiracy to commit bank fraud, money laundering, and tax evasion, collectively referred to as the "SUBJECT OFFENSES"), as described more fully in Attachment B, which is incorporated by reference. GREEN and STOLDEN are letter carriers who steal checks from the mail and give them to STINSON, who acts as a broker to sell them to others.  The premises to be searched (collectively referred to as the SUBJECT PREMISES), which are described more fully in attachments A which are also incorporated by reference, are as follows:

      a.    The residence of CHARLIE BANKS GREEN ("GREEN"), located at 4200 WHITTIER BOULEVARD, APT 315, LOS ANGELES, CA 90023 ("GREEN'S APARTMENT");

      b.    The residence of RASHAD DEON STOLDEN ("STOLDEN"), located at 18151 BEACH BOULEVARD, APT 301, HUNTINGTON BEACH, CA 92648, which includes ASSIGNED PARKING SPACES 21 and 22 ("STOLDEN'S APARTMENT");

      c.    The residence of ANNDRAYA ALLIE J. STINSON ("STINSON") located at 3875 COCO AVENUE, APT 9, LOS ANGELES, CA 90008 ("STINSON'S APARTMENT");

     d.   A SILVER 2010 KIA FORTE, with California license plate number 6PDM494 and Vehicle Identification Number ("VIN") KNAFT4A26A5854887 registered to CHARLIE BANKS GREEN ("GREEN'S VEHICLE");

     e.   A WHITE 2019 TOYOTA CAMRY with California license plate number 8LJW079 and VIN 4T1BZ1HK1KU029475 registered to RASHAD STOLDEN ("STOLDEN'S VEHICLE");

     f.   A TAN 2008 LINCOLN with front and back temporary dealer inserts that say "BLOKAUTO.COM" and VIN 3LNHM26T08R643900 which is unregistered ("STINSON'S VEHICLE").

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of our investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II. <u>PREVIOUS WARRANTS TARGETING THESE SUBJECTS</u>

5. On June 17, 2024, the Honorable Patricia Donahue issued a telephone tracker warrant for ANNDRAYA ALLIE J. STINSON, 424-521-4560 (STINSON'S PHONE), in 2:24-MJ-3594, which was renewed by the Honorable Alicia G. Rosenberg on July 31, 2024. On July 12, 2024, the Honorable Pedro Castillo issued a telephone tracker warrant for CHARLIE BANKS GREEN, 424-382-5693 (GREEN'S

PHONE), and the (old) telephone of RASHAD DEON STOLDEN, 310-661-1967 (STOLDEN'S OLD PHONE), in 2:24-MJ-4181, based on an earlier version of this affidavit.  On July 24, 2024, after I learned that STOLDEN had stopped using STOLDEN'S OLD PHONE and was using instead his new one, the Honorable Charles Eick issued a telephone tracker warrant for the new telephone of RASHAD DEON STOLDEN, 310-430-2853 (STOLDEN'S NEW PHONE) in 2:24-MJ-4409.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

#### A.   SUMMARY OF PROBABLE CAUSE

6. On March 20, 2024, a federal Search Warrant was executed on the San Fernando Valley residence of Akil RICKS ("RICKS"), which contained scores of counterfeit driver's licenses, fake Identification Documents, stolen checks, to include copies of stolen checks and counterfeit checks, and the equipment for counterfeiting identity documents. During the execution of the Search Warrant, law enforcement agents also seized digital devices from RICKS which revealed STINSON, using phone number 424-521-4560 ("STINSON'S PHONE"), supplied RICKS with stolen checks.

7. The USPS OIG and USPIS are investigating RICKS, STINSON, GREEN, STOLDEN and others for the receipt of stolen mail and conspiracy to commit bank fraud. Text messages exchanged between RICKS' phone and STINSON showed that STINSON has been in possession of checks stolen from the U.S. Mail.  STINSON made statements about being in possession of "slips" from the U.S Mail. In my training and experience, "slip" is a term used to describe a check. STINSON's texts showed she had been in contact

with individuals she described as "mail plugs" on various
occasions to inquire about obtaining "slips". In my training and
experience, "mail plug" is a term used to describe persons who
provide stolen mail.

8. Further investigation revealed CHARLIE BANKS GREEN JR.
and RASHAD DEON STOLDEN are two of the "mail plugs" referenced
in text messages between STINSON and RICKS.

**B.   RICKS' DIGITAL DEVICES SHOW STINSON SUPPLIES HIM WITH
CHECKS STOLEN FROM THE MAIL**

9. I reviewed data extracted from a cellphone owned by
RICKS, who has been under investigation by the Coast Guard
Investigative Services ("CGIS") for the manufacturing of
counterfeit credit cards and identifications. During my review I
discovered the following text exchanges between RICKS and
STINSON, whose phone number was listed under the contact name
"Skinny" in RICKS' phone:

g.   RICKS and "Skinny" (subsequently determined to be
Anndraya Allie J STINSON, as described later in this affidavit,
and hereafter referred to as STINSON for clarity) discussed
"mail plugs" and obtaining "slips" from them.  They also
discussed an individual referred to as "Tone", later identified
as Antonio Durante Thurman ("Thurman"), who passed away on
February 9, 2024.  Their conversations suggested that STINSON
and Thurman had been in a relationship, and indicated that
Thurman had been the sole contact with the "mail plugs" when he
was alive.  STINSON stated she now had the phone numbers for the

mail plugs and would begin reaching out to them for "work," which in context means criminal work.

       h.    In later conversations in February and March 2024, STINSON confirmed that she had been contacting the "mail plugs" about obtaining "slips", and asking them to look for high amounts. RICKS and STINSON also discussed depositing "slips" and the financial institutions associated with the "slips," implicitly confirming that "slips" were checks.

    10. GREEN was identified as the first "mail plug" based on information revealed in text messages between RICKS and STINSON. STINSON, who was listed as the contact "Skinny" with phone number 424-521-4560 (STINSON'S PHONE) in RICKS' phone, was identified as STINSON through law enforcement database checks on May 21, 2024 showing that she is the user/subscriber for the phone number 424-521-4560 (STINSON'S PHONE). In addition, records from T-Mobile further revealed STINSON as the subscriber for that phone as of June 11, 2024.

**C.   TEXT MESSAGES BETWEEN STINSON AND RICKS SHOW STINSON IS IN CONTACT WITH "MAIL PLUGS"**

11. Below are examples of text messages between STINSON and RICKS demonstrating STINSON is involved in the scheme, and is in contact with individuals involved with the mail:



12. In my training and experience, when STINSON ("Skinny") refers to "slips" above, she is talking about checks. Her statements "93 from 1/18/24" and "68 from 11/13/23" refer to the amounts and dates on checks. Her statements about "mail dudes" is most likely a reference to individuals who steal mail. The text messages further suggest that STINSON will call the "mail dudes" as STINSON stated she "got the[ir] number today." The

text messages show that the "mail dudes" referenced by STINSON
are most likely the individuals supplying her with checks from
the mail.



13. In the messages above, STINSON texts RICKS to say that
she is "picking up work" tomorrow, which in this context and in
my training and experience, means stolen checks.  RICKS seems to
want some of those checks, as he replies, "let me know if you
get anything that you don't use or give out."  The larger check
they had discussed before ("93") apparently was not successfully
negotiated as RICKS says it "blew" and that he was going to send
her a screenshot.  In my training and experience, criminals
often show each other proof that a fraudulent transaction was
not completed so that their partners in crime do not expect a
share of the money they hoped to steal. Further, when STINSON
says, "I'm picking up work… he just told me he got some", it

illustrates she is meeting with a male individual, who is going to supply her with checks.



14. The messages above were pulled and reviewed from another digital device seized during the execution of the search warrant targeting RICKS. In the messages between RICKS and an individual listed in his contacts as "Brennon (Bri Cousin)", RICKS tells Brennon the "93k is just a deposit". RICKS further explains to Brennon how to deposit another check, for Bank of America. The messages on February 7, 2024, to Brennon from RICKS, are sent one day after STINSON provides RICKS with a description of checks she has in her possession, on February 6, 2024, a "slip" for "93 from 1/18/24". It can be inferred from the messages between RICKS and Brennon, that the check referenced by STINSON which she had in her possession, was a

$93,000 check and that she further must have provided the check
to RICKS, for deposit. It is revealed that the $93,000 check was
provided to Brennon for deposit in message exchanges above.



15. In the messages above, on February 13, 2024, RICKS asks
Brennon to send him a screenshot of the 93 ($93K check) that
went bad so he can show "her" (STINSON) that he "didn't get
over."  It appears Brennon provides a screenshot, which did not

download to the phone. In the messages RICKS refers to the "93" that went bad. This coincides with previous messages between STINSON and RICKS from February 6, 2024. The larger check they had discussed before in the conversation regarding "slips", which STINSON had in her possession, the slip for "93", apparently was not successfully negotiated as RICKS tells STINSON it "blew" and that he was going to send her a screenshot. The messages between Brennon and RICKS confirm that Brennon could not negotiate the $93,000 check, as RICKS followed up and asked him for a screenshot for the attempted negotiation that was not successful. Other messages between RICKS and Brennon, discovered and reviewed from RICKS's other phone, reveal Brennon apparently lives in Houston, TX and also works with RICKS to deposit "slips" and share the funds from those deposits. The messages above indicate STINSON sold or provided the check in some capacity to RICKS, and that RICKS passed the check on to Brennon to deposit it.



16. In the messages above, RICKS asks for "slips" (stolen checks). STINSON texts that she is meeting with "him" (her source for the checks) that day and will show RICKS what she gets.



17. In the messages above, RICKS texts STINSON looking for "old slips that Tone had," specifically "stat slips."  In my training and experience, "stats" refers to U.S. Treasury checks in the criminal world.  In addition, when RICKS asks STINSON for "old slips that Tone had", it demonstrates that "Tone" was involved in the scheme and previously possessed the slips. "Tone" is the nickname for an individual identified as Antonio Durante Thurman, who was previously romantically involved with STINSON, and whom she shares a child with. (STINSON's social media Instagram account depicted a daughter who STINSON stated in one post bears the last name "Thurman," and in another that Antonio Thurman was her "baby daddy". There are also many comments on STINSON's Instagram posts of individuals calling her "skinny," the name RICKS used to message her).

18. I know "Tone" to be the nickname for Thurman because STINSON and RICKS reference "Tone" several times in their text messages. Thurman passed away in February 2024, and STINSON took over his role as a broker in the scheme afterward. Below, "Tone" was further identified as Thurman through obituary information STINSON sent RICKS for Antonio Durante Thurman, shortly after messages between the two discussing his passing. The link provides access to the website for Heritage Funeral Home and Chapel and official obituary information for Antonio Durante Thurman.



19. Thurman's phone number was found in RICKS's phone under the contact name "Gansta Tone", phone number 213-588-6925. After Thurman died, however, STINSON used Thurman's phone to

reach out to RICKS, as shown in the text message from February 5, 2024, from the contact "Gansta Tone", using phone number 213-588-6925 (Thurman's phone), but in which STINSON explained that the message was really from her ("Skinny"). It appears that STINSON used Thurman's phone to approach RICKS because she intended to take over Thurman's role as the middleman between the mail plugs who stole checks and RICKS who received them.



20. On February 5, 2024, text messages between STINSON under the contact name "Skinny", and RICKS then begin for the first time, discussing "work", "slips" and "mail plugs".

**D.   ONE OF THE "MAIL PLUGS" WHO SUPPLIES STINSON WITH STOLEN CHECKS IS GREEN**

21. Below are text messages between STINSON and RICKS having conversations about one of the "mail plugs."



22. In the messages above, on March 13, 2024, RICKS asks STINSON "are we working or not?" STINSON texts RICKS she's waiting on the plug and states "I hit him when I got back, imma hit up again right now". STINSON further texts RICKS, "I just talk to em he said he should have something today or 2mrw im on it". Below are text messages between STINSON and RICKS from March 17, 2024, which is a continuation of the conversation from

March 13, 2024, in which STINSON and RICKS are discussing STINSON contacting the "mail plug" again.



23. In the messages above, RICKS asks STINSON if there's been anything new. STINSON replies by saying "no nothing… I'll hit him up". Immediately after, and pictured below, in the messages between STINSON and RICKS, RICKS replies and asks STINSON "didn't they," meaning the mail plugs who stole the checks, "all go to the funeral?" STINSON tells RICKS, only one of the mail men went and nobody else from Los Angeles. The

messages allude to the fact the individual referenced in previous messages who STINSON has been contacting for "work" and "slips" is a mail man.



24. The funeral mentioned in the messages is believed to be the funeral for Thurman, which was held on February 24, 2024, in Marietta, GA, according to obituary information posted online. The messages above reveal a "mail man" STINSON is in contact with, believed to be one of the "mail plugs", attended the funeral on February 24, 2024.

25. On May 15, 2024, I pulled time and attendance records for all employees at the Bicentennial Post Office. The data revealed CHARLIE GREEN JR., who is a mail carrier at the post office, was on Annual Leave on February 22, 2024, and was on full day Leave Without Pay on February 23, 2024, and February 24, 2024, the day of Thurman's funeral.

26. On March 19, 2024, STINSON texts RICKS, "Hey the plug hit me but I don't have no money till Friday… here's a screenshot of what he got".



27. Below is the screenshot STINSON sent to RICKS, revealing her text messages with the "mail plug" who is listed in the STINSON PHONE contacts as "Worm," a name also used by GREEN (discussed in more detail below).



28. In the messages, the "mail plug," "Worm," texts STINSON "got a 4k piece, might have a little more later… but the 4k piece is 400". In my experience, when the "plug" says he has a "4k piece" that is "400" he is referring to a $4,000 check that he is offering to sell for $400, or about 10% of its actual value. In previous cases I have worked, I learned checks are often sold on the street for 10% of their value.

29. The contact name for the "plug" that STINSON has message exchanges with is "Worm". I queried GREEN's information through law enforcement database records, LexisNexis, which revealed one phone number tied to him is 424-382-5693 (GREEN'S PHONE). In addition, records from T-Mobile further confirmed GREEN as the subscriber/user for the phone number as of June 11, 2024.

30. A query through mobile payment service Cash App for GREEN'S PHONE number revealed the account associated with the phone number is for a "Charlie Green", with a Cash App username of "Lilwestworm". Further, I queried the name "lilwestworm" through Instagram, which revealed an Instagram account "lilwestworm28" with the name "Charlie Green" in the profile of the account. This is important because in the screenshot STINSON sends to RICKS, a conversation about stolen checks is between STINSON and the mail plug contact "Worm".

**E.   GREEN IS FURTHER IDENTIFIED AS THE "MAIL PLUG" THROUGH PREVIOUS CONTACT WITH THURMAN**

31. I reviewed toll records from T-Mobile historical text and call data for the phone number 424-382-5693 (GREEN'S PHONE),

belonging to GREEN, between June 1, 2023, and June 6, 2024, which revealed that GREEN had been in contact with phone number 213-588-6925, belonging to Thurman, 857 times during that period. The contact between Thurman and GREEN in the records for phone number 424-382-5693 (GREEN'S PHONE) stop in February 2024, shortly before Thurman passed away.

32. Further, toll records from T-Mobile for GREEN'S PHONE reveal GREEN has been in contact with phone number 424-521-4560 (STINSON'S PHONE), at least two times, using the phone number 424-382-5693 (GREEN'S PHONE). GREEN and STINSON contacted each other once on June 10, 2023, and once on September 9, 2023. Both forms of contact with STINSON's phone number were phone calls lasting at least thirty minutes.  Note that the text messages between "Worm" (GREEN) and STINSON discussed above would not necessarily appear in the call records for GREEN's PHONE even if GREEN and STINSON used only the phones described in this affidavit.  The messages with "Worm" showed in blue on the STINSON Phone, indicating that they were sent through Apple's proprietary iMessaging service, which provides encryption. According to Apple, while regular texting requires a cellular plan that permits it, iMessaging will use WiFi when available.

### F. Co-conspirators STOLDEN, GREEN, and STINSON Use Peer-to-Peer Money Transfer Apps to Pay for Checks Stolen from the Mail

33. I reviewed Cash App transaction data and records associated with GREEN's Cash App and STINSON's Cash App accounts for the period of June 1, 2023, through July 5, 2024. Cash App is a peer-to-peer mobile payment service that permits users to

transfer money between themselves.  Records revealed the Cash App account with username "Lilwestworm" and Cash App name "Charlie Green" is associated to phone number 424-382-5693 (GREEN'S PHONE). Records further revealed the Cash App account with username "Annie Zola" and Cash App name "Anndraya Stinson", is associated with phone number 424-521-4560 (STINSON'S PHONE), belonging to STINSON.

       1.   <u>STINSON Asks Both Postal Employees GREEN and STOLDEN to Call "Gansta Tone," the Middleman for the Sale of Checks Stolen from the Mail, Near Simultaneously</u>

34. A review of the records showed that on July 20, 2023, STINSON sent GREEN a Cash App request for $1 and included in the message line of the request "Antonio said call him 323-241-9301." That is, that Antonio Thurman, aka "Gansta Tone," the connection between the mail thieves and RICKS, wanted postal employee GREEN to call him.

35. On the same day, July 20, 2023, 27 seconds before STINSON sent the message request to GREEN, she also sent the same exact message, "Antonio said to call him 323-241-9301", to another individual with a Cash App username "Patrick P".  A review of the Cash App records revealed the Cash App account "Patrick P" belongs to RASHAD DEON STOLDEN ("STOLDEN") with associated phone number 310-661-1967 (STOLDEN'S OLD PHONE). Postal Service database queries revealed STOLDEN is a Postal Service letter carrier employed at the Bicentennial Post Office, where GREEN works. The Cash App request with a message from Stinson to both GREEN and STOLDEN on the same day, seconds

apart, asking both to contact Antonio, indicates STOLDEN is the
second Postal Service employee and "mail plug" involved in the
conspiracy.

**G.   T6 Postal Employees, Like GREEN and STOLDEN, Can Steal
       Mail Without Detection More Easily than Letter
       Carriers with a Consistent Route**

36. Both GREEN and STOLDEN are T6 postal employees,
according to postal records, meaning that they fill in for other
letter carriers on multiple routes, rather than delivering on
the same route every day like most letter carriers.  In my
training and experience, T6 carriers are especially likely to be
involved in mail theft.  If carriers who work the same route
every day pilfer mail entrusted to them, the pattern of stolen
mail will point to the correct carrier as the likely thief,
deterring them.  But because T6 carriers work multiple routes,
their thefts of mail will only point to them if the victim knows
exactly the day the mail was supposed to be delivered, which is
rare.  T6 employees like STOLDEN and GREEN, therefore, find it
easier to steal mail undetected.

37. Cash App records show that on August 23, 2023, STINSON
sent STOLDEN $1,200. On August 25, 2023, STINSON sent $200 TO
STOLDEN. On the same day, a few minutes later, STOLDEN sent $200
back to STINSON. Then a few hours later, on August 25, 2023,
STINSON sent the $200 to GREEN.  In my training and experience,
it is common for persons involved in the sale of stolen checks
to pay each other through peer-to-peer mobile payment services.
Typically, these transfers are for round dollar amounts.  They
often occur well after the stolen check has been delivered

because the purchaser either lacks the money to pay upfront and intends to rely on proceeds received later from reselling the check or negotiating it, or because the conspirators have agreed that payment is contingent or the successful negotiation of the check.

38. On September 2, 2023, STINSON received $550 from an individual with a Cash App username "Presto97". Several minutes later, on the same day, STINSON sent $590 to GREEN. On September 6, 2023, STINSON sent STOLDEN a Cash App request for $1 and included in the message line of the request "Antonio [i.e., "Gansta Tone"] said call ..his phone broke 4245214560." On September 9, 2023, STINSON sent $200 to STOLDEN. On September 11, 2023, STINSON sent $100 to STOLDEN, and on September 13, 2023, STINSON sent $190 to STOLDEN.

39. On September 14, 2023, STINSON received a payment of $120 from an individual with Cash App username "Cordale Jones". Included in the message line of the transaction, Jones wrote "tone", indicating the money is associated with "Gansta Tone" the nickname for Thurman, the former middleman between GREEN and STOLDEN on the one hand, and RICKS on the other. On October 18, 2023, STINSON received a payment of $900 from Jones. Several hours later, on the same day, STINSON sent the $900 to GREEN. In my training and experience, this pattern of one co-conspirator receiving funds and then quickly transmitting funds to another co-conspirator is indicative of the sale of stolen checks through a middleman.

40. On November 18, 2023, STINSON received a Cash App payment of $1,800 from Jones. Minutes later, STINSON sent $1,000 to STOLDEN. Several minutes after the payment to STOLDEN, STINSON sent $700 to Antonio Thurman, the former middleman and father of STINSON's baby. Based on the way the transactions are structured, it appears Jones sent $1,800 to STINSON as payment for stolen checks, Thurman received $700 for serving as middleman, STOLDEN got $1,000 for supplying the stolen check, and STINSON kept $100 for herself for facilitating the money transfers.

41. On December 22, 2023, STINSON received a payment of $750 from an individual with Cash App username "Mohamed Alzarooni". Several hours later, on the same day, Stinson sent $750 to STOLDEN.

42. On November 18, 2023, STINSON received a Cash App payment of $260 from "Antonio Thurman". Later that day, STINSON sent $178 to STOLDEN.

43. Records show that on January 14 and 15, 2024, Cash App user "Mohamed Alzarooni" sent STINSON a total of $850.  On January 16, 2024, GREEN requested $600 from STINSON. This is the second instance in which "Mohamed Alzarooni" sent a payment to STINSON, and STINSON then sent a marginally smaller amount to GREEN or STOLDEN, suggesting that STINSON is receiving a middleman's markup for transferring stolen checks from the "mail plugs" STOLDEN and GREEN to "Alzarooni."

44. On January 25, 2024, STINSON sent $290 to GREEN.

45. I also reviewed Cash App records solely for GREEN's account. The records revealed GREEN has received multiple payments through Cash App from "Antonio Thurman" and "ANNDRAYA STINSON" between August 2023 and January 2024. In addition, GREEN has several payments to and from "Patrick P", a.k.a. STOLDEN.  Most recently, on July 5, 2024, GREEN sent a payment of $500 to STOLDEN. This amount is consistent with the larger payments of several hundred dollars between GREEN, STINSON, and STOLDEN in the past, which indicates the fraud is most likely still going on between GREEN and STOLDEN.

### G.   PHOTOGRAPHS OF CHECKS FOUND IN RICKS'S PHONE ARE FROM THE BICENTENNIAL POST OFFICE WHERE GREEN AND STOLDEN WORK

46. During my review of the digital devices belonging to RICKS, I searched for images of U.S. Treasury checks. In the search I conducted, I discovered five photographs of U.S. Treasury checks that appeared to have been sent through the mail. Three out of the five U.S. Treasury checks were destined to addresses that are delivered to by the Bicentennial Post Office, where GREEN and STOLDEN work. One check was destined to "Brandan Freeman" for almost $120,000, one check was destined to "Chinuch Charedi of California", and one check was destined to "Shalom Fitusi". The two additional U.S. Treasury checks were destined to addresses in another state and appear to be unrelated. Because the photographs of the U.S. Treasury checks were discovered in the digital device, it is believed they did not arrive to their destination.

### H.   STOLEN CHECKS REPORTED BY A VICTIM WERE SUPPOSED TO BE DELIVERED BY STOLDEN

47. A victim of mail theft and fraud, W. K., reported that he has been concerned about mail theft out of the Bicentennial Post Office for several years, and advised that his address started to experience missing mail in about 2019. W. K. lives on a route which is operated out of the Bicentennial Post Office. He most recently reported to the OIG that he had two Internal Revenue Service (IRS) United States Treasury checks stolen in 2023. W. K. reported he was supposed to receive a refund check from the IRS in 2023, and it was stolen and fraudulently negotiated. W. K. reported a second replacement check he was supposed to receive later in 2023, was also stolen and never delivered to his address. Postal Service Informed Delivery records reveal the first check that was stolen and cashed was destined to be delivered to the victim's address on or about May 2, 2023, on route 7, operated out of the Bicentennial Post Office. The records reveal the second check that was never delivered was also destined to route 7, on or about July 15, 2023. Further Postal Service records reveal STOLDEN worked route 7, zip 90069, for Bicentennial Post Office on May 2, 2023, on or about the day the first reported stolen check would have been on the route and delivered. In addition, records reveal STOLDEN also worked the route on July 17, 2023, on or about the day the second reported stolen check was supposed to be delivered.

48. I subsequently received records from Moneytree, a financial services company. The records revealed W.K.'s first

Treasury check, in the amount of $1,731.66, which was intended for delivery on May 2, 2023, was fraudulently cashed on May 5, 2023, at a Moneytree location in Moreno Valley, CA, by an individual using a counterfeit Passport Card Identification Document ("ID"), in the name victim W.K.  I studied a copy of the counterfeit ID and saw that its photograph actually depicts Cordale Jones ("JONES"), one of the co-conspirators in this scheme who sent peer-to-peer payments to STINSON, the broker for GREEN and STOLDEN.

49. Additional Moneytree records disclosed on two additional occasions, once on October 11, 2023, and on October 26, 2023, JONES used two separate counterfeit IDs to cash two different Treasury checks in other individual's names. One of the checks was destined to a Los Angeles, CA resident, M. K., who lives on one of GREEN's routes out of the Bicentennial Post Office. One of the checks was destined to a Los Angeles, CA resident, C.B., who lives on one of STOLDEN's routes out of the Bicentennial Post Office.

50. On July 24, 2024, I reviewed records from Ace Cash Express, a financial services company. The records revealed W. K.'s second stolen Treasury check, which was a replacement refund check for the first one that was stolen in the amount of $1,731.66, was fraudulently cashed on August 2, 2023, at an Ace Cash Express. Further photo surveillance captured from Ace Cash Express revealed the individual who cashed the check was also JONES. STINSON received a combined total of $5,150 in several

separate payments from JONES between October 11, 2023, and
October 26, 2023.

## I. REPORTS OF CHECK THEFT AT THE BICENTENNIAL POST OFFICE ROSE IN 2020

51. I have reviewed financial complaint records filed by
Los Angeles residents and postal customers who receive their
mail from the Bicentennial Post Office, in which I reviewed
numerous reports of check theft reported between 2017 and 2024.
Notably, in 2020 complaints of check theft reported by customers
from the Bicentennial Post Office began to rise, doubling from
complaints reported between 2017 and 2019. More importantly, the
reports of check theft beginning in 2020 seem to be more related
to internal mail theft. Many of the customers who reported
stolen checks in 2020 had Informed Delivery, in which they
received notifications that checks were due to be delivered to
their addresses, yet never arrived and were cashed, many of
which were stimulus checks. GREEN and STOLDEN were both working
at the Bicentennial Post Office in 2020, when the internal mail
thefts more than doubled.  But for several months of 2020, GREEN
was working at a different post office called West Los Angeles.
Complaints consistent with the internal mail theft trends
occurring at Bicentennial were also reported for the West Los
Angeles Post Office at the time, consistent with many of the
routes GREEN was working there.

## J. GREEN RESIDES AT GREEN'S APARTMENT AND DRIVES GREEN'S VEHICLE

52. I reviewed California Department of Motor Vehicles
("DMV") records for GREEN, which revealed the address listed on

his Driver's License is 4200 WHITTIER BOULEVARD, APT 315, LOS
ANGELES, CA 90023 (GREEN'S APARTMENT).

53. On June 17, 2024, I queried Law Enforcement databases
and records from the DMV, which revealed GREEN is the registered
owner of a 2010 KIA FORTE with California license plate 6PDM494
(GREEN'S VEHICLE).

54. On July 15, 2024, I began to receive GPS/cell-site
information for GREEN's PHONE, phone number 424-382-5693, which
was obtained with a warrant. The location data for GREEN's PHONE
has consistently shown over multiple days that GREEN's PHONE is
within 0.6 miles or approximately 965 meters from GREEN'S
APARTMENT, which is listed on GREEN's driver's license and where
GREEN receives mail.  This is within the margin for error of the
location information for GREEN'S PHONE, and is consistent with
GREEN residing at GREEN'S APARTMENT.

55. On July 23, 2024, I received postal records which
revealed GREEN receives packages at GREEN'S APARTMENT.

56. On July 23, 2024, I observed GREEN'S VEHICLE, a 2010
KIA FORTE with California license plate 6PDM494, parked in the
employee lot at the Bicentennial Post Office, while GREEN was at
work.

57. On July 26, 2024, I confirmed with the manager of the
apartment complex at 4200 WHITTIER BOULEVARD, LOS ANGELES, CA
90023, that GREEN resides in APARTMENT 315. I also confirmed
with the manager that GREEN's vehicle is a KIA FORTE with
license plate 6PDM494 (GREEN'S VEHICLE).

**K.   STOLDEN RESIDES AT STOLDEN'S APARTMENT AND DRIVES STOLDEN'S VEHICLE**

58. I have reviewed California DMV records for STOLDEN, which revealed the address listed on his Driver's License is 18151 HUNTINGTON BEACH BOULEVARD, APT 301, HUNTINGTON BEACH, CA 92648 (STOLDEN'S APARTMENT).

59. On July 18, 2024, I received postal records which revealed STOLDEN receives packages at the STOLDEN'S APARTMENT.

60. On July 25, 2024, I began to receive GPS/cell-site information for phone number 310-430-2853 (STOLDEN'S NEW PHONE), which was obtained with a warrant. The location data for STOLDEN'S NEW PHONE has shown it has been most often within 0.3 miles or approximately 482 meters, from STOLDEN'S APARTMENT, which is listed on STOLDEN's driver's license and where STOLDEN receives mail.  This is within the margin for error for the location information, and is consistent with STOLDEN residing at STOLDEN'S APARTMENT.

61. On July 18, 2024, at approximately 5:00 AM, U.S. Postal Inspector Adam Bardaro conducted surveillance at 18151 BEACH BOULEVARD, HUNTINGTON BEACH, CA 92648 (STOLDEN'S APARTMENT). At approximately 6:09 AM Inspector Bardaro observed STOLDEN'S VEHICLE, a WHITE 2019 TOYOTA CAMRY with California license plate number 8LWJ079 parked in the backlot of 18151 BEACH BLVD, HUNTINGTON BEACH, CA 92648 (STOLDEN'S APARTMENT) in the second to the last row, in ASSIGNED PARKING SPACE 21. On July 17, 2024, I queried Law Enforcement databases and records from the DMV

which revealed the registered owner of that 2019 TOYOTA CAMRY is STOLDEN.

62. On July 25, 2024, U.S. Postal Inspector Katherine Trivino conducted surveillance at 18151 BEACH BLVD., HUNTINGTON BEACH, CA 92648. At approximately 6:15 AM Inspector Trivino observed STOLDEN and a woman identified as Tina Denton, who also receives mail at STOLDEN'S APARTMENT, walk down the stairs of the apartment complex. STOLDEN was then observed entering the WHITE TOYOTA CAMRY with California license plate 8LWJ079 (STOLDEN'S VEHICLE), which was parked in the backlot of the complex in ASSIGNED PARKING SPACE 21. At approximately 6:19 AM STOLDEN exited the parking lot.

63. On July 30, 2024, Postal Inspector Bardaro confirmed with the Maintenance Supervisor at STOLDEN'S APARTMENT complex that residents at the complex have assigned parking spaces. The Maintenance Supervisor advised that the residents of APARTMENT 301 (STOLDEN'S APARTMENT) are assigned to PARKING SPACES 21 and 22 located in the West parking lot behind 18151 BEACH BOULEVARD, HUNTINGTON BEACH, CA 92648 (STOLDEN'S APARTMENT). Continued on this day, Inspector Bardaro observed the WHITE TOYOTA CAMRY with California license plate number 8LWJ079 (STOLDEN'S VEHICLE) parked in ASSIGNED PARKING SPACE 21.

**L.   STINSON RESIDES AT STINSON'S APARTMENT AND DRIVES STINSON'S VEHICLE**

64. I have reviewed California DMV records for STINSON, which revealed the address listed on her Driver's License is

3875 COCO AVE, APT 9, LOS ANGELES, CA 90008 (STINSON'S
APARTMENT).

65. On June 18, 2024, I began to receive GPS/cell-site
information for STINSON's phone, phone number 424-521-4560
(STINSON'S PHONE), which was obtained with a warrant. The
location data, within an 88-meter accuracy, for STINSON's phone
has shown it has been mostly at or near the listed address on
her driver's license, 3875 COCO AVE, LOS ANGELES, CA 90008
(STINSON'S APARTMENT), since June 18, 2024.

66. On June 26, 2024, I conducted surveillance on 3875 COCO
AVE, APT 9, LOS ANGELES, CA 90008 (STINSON'S APARTMENT). At
approximately 11:40 AM I observed STINSON exit the front gate
entrance of 3875 COCO AVE., LOS ANGELES, CA 90008, the complex
which contains STINSON'S APARTMENT. I observed STINSON walk down
the sidewalk on COCO AVENUE before going out of sight and
disappearing. It appeared STINSON entered a vehicle. I then
observed a TAN LINCOLN (later identified as STINSON'S VEHICLE),
which was parked on COCO AVENUE, drive off. The vehicle had
front and back temporary dealer inserts that said
"BLOKAUTO.COM". At approximately 12:10 PM the location data for
STINSON'S PHONE updated to reveal her location moved from the
area of STINSON'S APARTMENT, as though she had driven off in
STINSON'S VEHICLE as I surmised.

67. During the morning of June 28, 2024, I observed STINSON
exit and enter the apartment complex of 3875 COCO AVENUE, LOS
ANGELES, CA 90008, which contains STINSON'S APARTMENT, four
times.  Later, I observed the TAN LINCOLN MKZ (STINSON'S

VEHICLE) return on COCO AVENUE, and parallel park on the street outside of 3875 COCO AVENUE, LOS ANGELES, CA 90008 (STINSON'S APARTMENT).  I then observed STINSON exit the driver's seat of STINSON'S VEHICLE (the TAN LINCOLN MKZ) and walk back inside the front gate of the residence at 3875 COCO AVENUE, LOS ANGELES, CA 90008 (STINSON'S APARTMENT).

68. On two occasions I have witnessed STINSON using the 2008 LINCOLN MKZ, bearing paper insert reading "BLOKAUTO.COM" (STINSON'S VEHICLE). I have never witnessed STINSON driving another vehicle, nor have I seen anyone else drive STINSON'S VEHICLE.  Further, the two times I have seen STINSON'S VEHICLE, it has been parked on COCO AVENUE, which is adjacent to the complex that contains STINSON'S APARTMENT.

**M.   STINSON HAS KEPT CHECKS IN HER VEHICLE IN THE PAST**

69. On February 2, 2024, in text messages between RICKS and phone number 424-521-4560 (STINSON'S PHONE), RICKS asked STINSON "Did he tell you anything about the slips?", meaning did Antonio Thurman tell you about the checks before he passed away? RICKS continued, "You're really going to need all you can with this going on," meaning that STINSON would need money now that Antonio Thurman had passed and could no longer support her. STINSON replied, "Yeah your right I was actually gonna bring it up all that stuff [the stolen checks] is in the car I will retrieve it in the morning."

## IV. <u>TRAINING AND EXPERIENCE REGARDING BANK FRAUD, MAIL THEFT, and CONSPIRACY</u>

70. In addition to the foregoing facts, I have learned during my tenure as a Special Agent with the USPS OIG and from my conversations with other law enforcement agents who investigate fraud and mail theft that:

a. Individuals involved in fraud schemes, such as bank fraud, often use computers, cellular telephones, and mobile "smart phones" to conduct their fraudulent transactions. For example, such individuals often use computers, cellular telephones, and mobile smart phones to conduct online banking, the records of which may be stored on digital devices rather than paper records.

b. Persons who carry out fraud schemes typically use computers, cellular telephones, and mobile smart phones to communicate with their co-conspirators. As discussed previously in the affidavit, the TARGET SUBJECTS used various mobile payment services to participate in the scheme, communicate with each other about the fraud, and send funds back and forth to each other. In addition, several of the co-conspirators involved in the scheme have contacted each other many times through text messages and phone calls completed over cellular telephones.

c. Individuals who engage in fraud schemes often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other

digital devices for years after the fraudulent scheme has been completed.

  d. Individuals who engage in fraud schemes commonly maintain paper records like bank statements, receipts, and other financial documents commonly used in fraudulent schemes at their residences and in their vehicles.

 71. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

  a. People who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

  b. It is a common for persons involved in mail theft to obtain counterfeit identity documents for themselves or others to aid in the negotiation of stolen checks or the use of stolen credit cards. More sophisticated mail thieves or their conspirators often counterfeit checks using a scan of a stolen check as the template. Commonly such criminals maintain the equipment to make such counterfeit checks in their residences. They also often have images of the stolen or counterfeited checks on their digital devices, which they typically keep on

their persons, in their cars, and in their residences, as they do their counterfeit identity documents and records of the same.

c.    It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

d.    Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

e.    It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth,

driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

f.    Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

### V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

72. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

     b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

73. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

74. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the TARGET SUBJECTS' thumbs and/or

fingers on the device(s); and (2) hold the device(s) in front of the TARGET SUBJECTS' face with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

75. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

## VI. <u>CONCLUSION</u>

76. For all of the reasons described above, there is probable cause to believe that that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES, as described in Attachments A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
August, 2024.


_____
UNITED STATES MAGISTRATE JUDGE